UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| MONICA ACERRA, Individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>v.<br><br>TRULIEVE CANNABIS CORP., KIM RIVERS, and MOHAN SRINIVASAN,<br><br>        Defendants. | Case No.<br><br>CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>JURY TRIAL DEMANDED |

   Plaintiff Monica Acerra ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, public filings, wire and press releases published by and regarding Trulieve Cannabis Corp. ("Trulieve" or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

   1.  This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded Trulieve securities between September 25, 2018 and December 17, 2019, inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

{00360150;2 }           1

## JURISDICTION AND VENUE

2. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

4. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

5. In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6. Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased Trulieve securities during the Class Period and was economically damaged thereby.

7. Defendant Trulieve, together with its subsidiaries, purports to operate as a medical marijuana company. The Company cultivates and produces products in-house and distributes its products to Trulieve branded stores (dispensaries) in Florida, as well as directly to patients through home delivery. Trulieve is incorporated in British Columbia, Canada, and its head office is located at 6749 Ben Bostic Road, Quincy, Florida 32351. Trulieve's securities trades on the OTCQX under the ticker symbol "TCNNF."

8.  Defendant Kim Rivers ("Rivers") has served as the Company's Chief Executive Officer during the Class Period.

9.  Defendant Mohan Srinivasan ("Srinivasan") has served as the Company's Chief Financial Officer since January 2019.

10. Defendants Rivers and Srinivasan are collectively referred to herein as the "Individual Defendants."

11. Each of the Individual Defendants:

    a)  directly participated in the management of the Company;

    b)  was directly involved in the day-to-day operations of the Company at the highest levels;

    c)  was privy to confidential proprietary information concerning the Company and its business and operations;

    d)  was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

    e)  was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

    f)  was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

    g)  approved or ratified these statements in violation of the federal securities laws.

12. Trulieve is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

13. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Trulieve under *respondeat superior* and agency principles.

14. Defendants Trulieve and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Materially False and Misleading Statements Issued During the Class Period

15. On September 25, 2018, Trulieve filed a listing statement (the "Listing Statement") with the Canadian Securities Exchange ("CSE") following Trulieve, Inc.'s merger with Schyan Exploration Inc., forming Trulieve.

16. The Listing Statement stated that Trulieve utilized High-Yield Cultivation Facilities and Techniques, stating, in pertinent part:

> Trulieve transforms raw cannabis flower into the Trulieve portfolio of products sold in Trulieve stores. With a focus on scalable operations, Trulieve has detailed Standard Operating Procedures as well as robust training protocols across its cultivation facilities to grow a consistent, high quality product.
>
> Trulieve currently operates 468,000 square feet of cultivation facilities across three sites. Per Florida law, Trulieve grows in enclosed structures operating both indoor and greenhouse style grows. Trulieve currently has the ability to grow 17,199 kg of cannabis annually. Trulieve has an additional 95,420 square feet of cultivation capacity under construction which Trulieve anticipates will be completed by December 31, 2018. Upon completion, Trulieve will have an additional 9,804 kg per year of capacity, for a total cultivation capacity of 27,005 kg per year. In addition, Trulieve is working to rapidly and substantially increase its greenhouse capacity. The ability to quickly execute and operate high-yield, scaled cultivation operations is critical in Florida as well as other vertical markets. Trulieve grows a variety of 45 cannabis flower strains and is poised for expansion if the State allows flower products for smoking. Continuing the Trulieve philosophy of standing behind the products Trulieve sells, Trulieve utilizes a third-party company to certify

the genetic composition of each strain of cannabis Trulieve produces and provides the certified reports to patients and physicians.

17. The Listing Statement stated that the Company had $9.7 million in biological assets for fiscal year 2017. The Listing Statement described how the Company accounted for biological assets, stating, in pertinent part:

> The Company measures biological assets consisting of medical cannabis plants at fair value less cost to sell up to the point of harvest, which becomes the basis for the cost of internally produced work in progress and finished goods inventories after harvest. Unrealized gains or losses arising from changes in fair value less cost to sell during the year are included in the results of operations of the related year. The Company expenses pre-harvest costs as incurred.

18. On November 19, 2018, Trulieve filed with the CSE its Financial Statements and Management Discussion and Analysis for the period ended September 30, 2018 (collectively, the "3Q 2018 Financials"). The 3Q 2018 Financials were signed by Defendant Rivers. The 3Q 2018 Financials were also accompanied by signed certifications by the Individual Defendants, attesting that the financial statements contained no misrepresentations and fairly presented the Company's financial condition.

19. The 3Q 2018 Financials stated the following regarding related party transactions:

**Transactions with Related Parties**

As at September 30, 2018, the Corporation had related party notes payable of $14.0 million compared to December 31, 2017 which had related party notes payable of $8.7 million.

Additionally, several of the Corporation's dispensaries are leased from various real estate holding companies that are managed, controlled by a Director and shareholder.

20. The 3Q 2018 Financials reported gross profit, stating, in relevant part:

Gross profit after net gains on biological asset transformation for the three months ended September 30, 2018 was $35.8 million, up $32.1 million or 890%, from $3.6 million for the three months ended September 30, 2017, driven by an increased gain on biological assets and increased retail sales.

> Gross profit after net gains on biological asset transformation for the nine months ended September 30, 2018 was $71.8 million, up $60.7 million or 545%, from $11.1 million for the nine months ended September 30, 2017, driven by an increased gain on biological assets and increased retail sales.

21. The 3Q 2018 Financials stated that the Company had $33.7 million in biological assets as of September 30, 2018. The 3Q 2018 Financials described how the Company accounted for biological assets, stating, in pertinent part:

> The Company values its biological assets at the end of each reporting at fair value less costs to sell and complete. This is determined using a valuation model to estimate the expected harvest yield per plant applied to the estimated price per gram less processing and selling costs. This model considers the progress in the plant life cycle.
>
> The significant assumptions used in determining the fair value of medical cannabis plants are as follows:
>
> - wastage of plants based on their various stages;
> - yield by strain of plant;
> - percentage of costs incurred to date compared to the total costs to be incurred are used to estimate the fair value of an in-process plant; and
> - percentage of costs incurred for each stage of plant growth was estimated. On average, the grow cycle is 14 weeks after they become established vegetative plants.

22. On April 10, 2019, Trulieve filed with the CSE its Audited Annual Financial Statements and Management Discussion and Analysis for the period ended December 31, 2018 (the "FY 2018 Financials"). The FY 2018 Financials were signed by the Individual Defendants, and were accompanied by signed certifications by the Individual Defendants, attesting that the financial statements contained no misrepresentations and fairly presented the Company's financial condition.

23. The FY 2018 Financials reported gross profit, stating, in relevant part:

> Gross profit after net gains on biological asset transformation for the year ended December 31, 2018 was $105.6 million, up $87.2 million or 473%, from $18.4 million for the year ended December 31, 2017, driven by an increased gain on biological assets and increased retail sales. Additionally, because the Company is

growing more plants at December 31, 2018 than it was at December 31, 2017, so there are more plants undergoing transformation thus more gain.

Gross profit after net gains on biological asset transformation for the three months ended December 31, 2018 was $33.7 million, up $26.4 million or 363%, from $7.3 million for the three months ended December 31, 2017, driven by an increased gain on biological assets and increased retail sales.

24. The FY 2018 Financials stated the following regarding related party transactions:

The Company had raised funds by issuing notes to various related parties including directors, officers, and shareholders and the balance at December 31, 2018 and 2017 was $14,215,131 and $8,730,563, respectively, as discussed in "Note 8 – Notes Payable Related Party".

The Company uses a general contractor that is the spouse of an officer and director of the Company and made payments totaling $8,774,754 for the year ended December 31, 2018. There was also accounts payable to the related party of $3,356,511 at December 31, 2018, as discussed in "Note 5 – Property and Equipment".

The Company has many leases from various real estate holding companies that are managed, controlled by various related parties including a former director and shareholder and the spouse of an officer and director of the Company, see "Note 14 – Commitments and Contingencies".

25. The FY 2018 Financials stated that the Company had $29.6 million in biological assets as of December 31, 2018. The FY 2018 Financials described how the Company accounted for biological assets, stating, in pertinent part:

The Company measures biological assets consisting of medical cannabis plants at fair value less cost to sell up to the point of harvest, which becomes the basis for the cost of internally produced work in progress and finished goods inventories after harvest. Unrealized gains or losses arising from changes in fair value less cost to sell during the year are included in the results of operations of the related year. The Company expenses pre-harvest costs as incurred.

\* \* \*

*Biological assets and inventory*

In calculating the value of the biological assets and inventory, management is required to make a number of estimates, including estimating the stage of growth of the cannabis up to the point of harvest, harvesting costs, selling costs, sales price, wastage and expected yields for the cannabis plant. In calculating final inventory

values, management is required to determine an estimate of spoiled or expired inventory and compares the inventory cost to estimated net realizable value.

26.     On May 28, 2019, Trulieve filed with the CSE its Financial Statements and Management Discussion and Analysis for the period ended March 31, 2019 (collectively, the "1Q 2019 Financials").  The 1Q 2019 Financials were accompanied by signed certifications by the Individual Defendants, attesting that the financial statements contained no misrepresentations and fairly presented the Company's financial condition.

27.     The 1Q 2019 Financials reported gross profit, stating, in relevant part:

> Gross profit after net gains on biological asset transformation for the three months ended March 31, 2019 was $40.1 million, up $24.3 million or 154%, from $15.8 million for the three months ended March 31, 2018. This increase was driven by an increased gain on biological assets and increased retail sales. Additionally, because the Corporation was growing more plants as of March 31, 2019 than it was as of March 31, 2018, there are more plants undergoing transformation and therefore more gain.

28.     The 1Q 2019 Financials stated that the Company had $34.2 million in biological assets as of March 31, 2019.  The 1Q 2019 Financials described how the Company accounted for biological assets, stating, in pertinent part:

> Biological assets are measured at fair value less costs to sell until harvest. All production costs related to biological assets are expensed as incurred. All direct and indirect costs related to both biological assets and inventory are included in the 'cost of goods sold' line on the accompanying condensed consolidated interim statements of operations.
>
> The fair value measurements for biological assets have been categorized as Level 3 fair values based on the inputs to the valuation technique used. The fair value was determined using a model which assumes the biological assets at the condensed consolidated interim statements of financial position date will grow to maturity, be harvested and converted into finished goods inventory and sold in the medical cannabis market. The Company's method of accounting for biological assets attributes value accretion on a straight-line basis throughout the life of the biological asset from initial cloning to the point of harvest.

29.     On August 14, 2019, Trulieve filed with the CSE its Financial Statements and Management Discussion and Analysis for the period ended June 30, 2019 (collectively the "2Q

2019 Financials"). The 2Q 2019 Financials were accompanied by signed certifications by the Individual Defendants, attesting that the financial statements contained no misrepresentations and fairly presented the Company's financial condition.

30. The 2Q 2019 Financials reported gross profit, stating, in relevant part:

> Gross profit after net gains on biological asset transformation for the three months ended June 30, 2019 was $103.8 million, up $83.5 million or 412%, from $20.3 million for the three months ended June 30, 2018. This increase was driven by an increased gain on biological assets and increased retail sales. Additionally, because the Corporation was growing more plants as of June 30, 2019 than it was as of June 30, 2018, there are more plants undergoing transformation and therefore more gain.
>
> Gross profit after net gains on biological asset transformation for the six months ended June 30, 2019 was $143.9 million, up $107.8 million or 299%, from $36.1 million for the six months ended June 30, 2018. This increase was driven by an increased gain on biological assets and increased retail sales. Additionally, because the Corporation was growing more plants as of June 30, 2019 than it was as of June 30, 2018, there are more plants undergoing transformation and therefore more gain.

31. The 2Q 2019 Financials stated that the Company had $49.4 million in biological assets as of June 30, 2019. The 2Q 2019 Financials described how the Company accounted for biological assets, stating, in pertinent part:

> Biological assets are measured at fair value less costs to sell until harvest. All production costs related to biological assets are expensed as incurred. All direct and indirect costs related to both biological assets and inventory are included in the 'cost of goods sold' line on the accompanying condensed consolidated interim statements of operations.
>
> The fair value measurements for biological assets have been categorized as Level 3 fair values based on the inputs to the valuation technique used. The fair value was determined using a model which assumes the biological assets at the condensed consolidated interim statements of financial position date will grow to maturity, be harvested and converted into finished goods inventory and sold in the medical cannabis market. The Company's method of accounting for biological assets attributes value accretion on a straight-line basis throughout the life of the biological asset from initial cloning to the point of harvest.

32. On November 18, 2019, Trulieve filed with the CSE its Financial Statements and Management Discussion and Analysis for the period ended September 30, 2019 (the "3Q 2019

Financials"). The 3Q 2019 Financials were accompanied by signed certifications by the Individual Defendants, attesting that the financial statements contained no misrepresentations and fairly presented the Company's financial condition.

33. The 3Q 2019 Financials reported gross profit, stating, in relevant part:

> Gross profit after net gains on biological asset transformation for the three months ended September 30, 2019 was $110.1 million, up $74.3 million or 208%, from $35.8 million for the three months ended September 30, 2018. This increase was driven by an increased gain on biological assets and increased retail sales. Additionally, because the Corporation was growing more plants as of September 30, 2019 than it was as of September 30, 2018, there are more plants undergoing transformation and therefore more gain.

> Gross profit after net gains on biological asset transformation for the nine months ended September 30, 2019 was $254.0 million, up $182.2 million or 254%, from $71.8 million for the nine months ended September 30, 2018. This increase was driven by an increased gain on biological assets and increased retail sales. Additionally, because the Corporation was growing more plants as of September 30, 2019 than it was as of September 30, 2018, there are more plants undergoing transformation and therefore more gain.

34. The 3Q 2019 Financials stated that the Company had $62.4 million in biological assets as of September 30, 2019. The 3Q 2019 Financials described how the Company accounted for biological assets, stating, in pertinent part:

> Biological assets are measured at fair value less costs to sell until harvest. All production costs related to biological assets are expensed as incurred. All direct and indirect costs related to both biological assets and inventory are included in the 'cost of goods sold' line on the accompanying condensed consolidated interim statements of operations.

> The fair value measurements for biological assets have been categorized as Level 3 fair values based on the inputs to the valuation technique used. The fair value was determined using a model which assumes the biological assets at the condensed consolidated interim statements of financial position date will grow to maturity, be harvested and converted into finished goods inventory and sold in the medical cannabis market. The Company's method of accounting for biological assets attributes value accretion on a straight-line basis throughout the life of the biological asset from initial cloning to the point of harvest.

35. The statements contained in ¶¶ 16-34 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Trulieve overstated its mark-up on its biological assets; (ii) therefore, Trulieve's reported gross profit was inflated; (iii) Trulieve engaged in an undisclosed related party real estate sale with Defendant Rivers' husband; and (iv) as a result, Defendants' statements about its business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### The Truth Begins to Emerge

36. On December 17, 2019, during market hours, Grizzly Research published a report (the "Report") explaining that Trulieve had failed to disclose: (i) real estate transactions with insiders; (ii) that rather than high-quality indoor production, the vast majority of the Company's marijuana was produced in low quality hoop houses; and (iii) the Company's markup on biological assets was excessive and unreasonable.

37. The Report provided evidence that One More Wish LLC, an entity in which Trulieve engaged in a real estate transaction, was controlled by Defendant Rivers' husband, JT Burnett:

> One More Wish is like most of the companies in Kim Rivers' and Burnette's network: A murky company without business website, any kind of description about what it does, and a weird name. Trulieve doesn't disclose its existence.
>
> The Principal address of One More Wish, LLC is 178 May Nursery Rd, Havana, FL 32333, which is the address of the May Nursery, and was changed in February 2018. Warranty records show that previously One More Wish's address was 3919 W Millers Bridge Road, Tallahassee, FL 32312, which is Kim Rivers and Burnette's home address.

> ***Florida county records show that One More Wish bought a property at Blue Star Highway in Quincy in June 2018 and sold it to Trulieve in August 2018 for a 42% gain which translates to over 800% annualized return.*** The timing of this transaction was also very suspicious, as it must have become clear to insiders that with the upcoming offering funds would come available to the firm. Why not flip some land for a nice gain into the own pockets. The letter of intent to reverse merge Trulieve into a public shell was signed in June 2018.
>
> This exact property was sold in a sale leaseback commitment to [Innovative Industrial Properties] "IIPR" for $1,700,000, which is very weird because our [on-the-ground due diligence] "otgdd" indicates that this is not the property described in the press release by IIPR. Our on the ground research showed that this parcel has the warehouses described in the PR, which Trulieve also happened to have acquired from One More Wish. ***In fact, One More Wish sold two more properties to Trulieve for spectacular gains. One more Wish bought this property in December 2017 for $20,000 and this property in April 2017 for $1,200,000. Both were sold together to Trulieve in June 2018 for $2,170,000.***
>
> We also note that One More Wish buys properties from an entity with the peculiar name Big Wish LLC. We were able to link Big Wish to the very same network. Records don't show any registered agents or addresses for Big Wish that have anything to do with insiders, but we found an easement from 2017 where JT Burnette signed as the representative of both One More Wish LLC and Big Wish LLC.
>
> [image omitted]
>
> There seems to be a pattern where Big Wish LLC purchases properties at distressed prices, sells them to One More Wish, which then sells them on. This pattern reminds us of the property short sale scheme that Maddox and Carter Paige orchestrated, but is impossible to prove without inside records.

(Emphases added.)

38. The Report also explained after researching Trulieve's manufacturing facilities, it was found that the vast majority of the Company's cultivation facilities were "low-quality hoop houses" that were "prone to infestations and weather damage."

39. The Report went on to explain that the Company's markups on biological assets were likely inflated as a result:

> Trulieve sports unbelievable gross margins of 130% on average. This is mainly due to the biological assets fair value adjustment that is widely adopted within the

{00360150;2 }  12

industry. However, Trulieve seems to be aggressively using this accounting method towards its benefit to inflate its gross profit and margins.

\* \* \*

Upon closer inspection we realize that at any given time, Trulieve holds an abnormally large amount of biological assets. Biological assets should typically be used to support revenue. However, we are seeing that Trulieve's biological assets utilization efficiency is relatively low compared to peers. In other words, for every dollar in biological assets, Trulieve is able to generate the least amount of dollar sales. This strongly suggests that the mark-up on these assets is overstated.

40. On this news, shares of Trulieve fell $1.51 per share, or over 12.6%, to close at $10.40 per share on December 17, 2019, damaging investors.

41. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**PLAINTIFF'S CLASS ACTION ALLEGATIONS**

42. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons, other than Defendants, who acquired Trulieve securities publicly traded on OTCQX during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of Trulieve, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

43. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Trulieve securities were actively traded on OTCQX. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

44. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

45. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

46. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition and business of Trulieve;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused Trulieve to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of Trulieve securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

47. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

48. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Trulieve shares met the requirements for listing, and were listed and actively traded on the OTCQX, an efficient market;

- As a public issuer, Trulieve filed periodic public reports;

- Trulieve regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- Trulieve's securities were liquid and traded with moderate to heavy volume during the Class Period; and

- Trulieve was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

{00360150;2} 15

49. Based on the foregoing, the market for Trulieve securities promptly digested current information regarding Trulieve from all publicly available sources and reflected such information in the prices of the shares, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

50. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## COUNT I

### (For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

51. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

52. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

53. During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

54. Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Trulieve securities during the Class Period.

55. Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Trulieve were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of Trulieve, their control over, and/or receipt and/or modification of Trulieve's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Trulieve, participated in the fraudulent scheme alleged herein.

56. The Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Trulieve personnel to members of the investing public, including Plaintiff and the Class.

57. As a result of the foregoing, the market price of Trulieve securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff

and the other members of the Class relied on the statements described above and/or the integrity of the market price of Trulieve securities during the Class Period in purchasing Trulieve securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

58. Had Plaintiff and the other members of the Class been aware that the market price of Trulieve securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Trulieve securities at the artificially inflated prices that they did, or at all.

59. As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

60. By reason of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of Trulieve securities during the Class Period.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

61. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

62. During the Class Period, the Individual Defendants participated in the operation and management of Trulieve, and conducted and participated, directly and indirectly, in the conduct of Trulieve's business affairs. Because of their senior positions, they knew the adverse non-public information about Trulieve's misstatement of revenue and profit and false financial statements.

63. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Trulieve's

financial condition and results of operations, and to correct promptly any public statements issued by Trulieve which had become materially false or misleading.

64. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Trulieve disseminated in the marketplace during the Class Period concerning Trulieve's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Trulieve to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Trulieve within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Trulieve securities.

65. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Trulieve.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of Plaintiff and the Class, prays for judgment and relief as follows:

A. declaring this action to be a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiff's counsel as Lead Counsel;

B. awarding damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

C. awarding Plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. awarding Plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: February 12, 2020

>Respectfully submitted,
>
>POMERANTZ LLP
>
>*/s/ Jeremy A. Lieberman*
>Jeremy A. Lieberman
>J. Alexander Hood II
>600 Third Avenue, 20th Floor
>New York, New York 10016
>Telephone: (212) 661-1100
>Facsimile: (212) 661-8665
>Email: jalieberman@pomlaw.com
>Email: ahood@pomlaw.com
>
>POMERANTZ LLP
>Patrick V. Dahlstrom
>10 South La Salle Street, Suite 3505
>Chicago, Illinois 60603
>Telephone: (312) 377-1181
>Facsimile: (312) 377-1184
>Email: pdahlstrom@pomlaw.com
>
>BRONSTEIN, GEWIRTZ
>& GROSSMAN, LLC
>Peretz Bronstein
>60 East 42nd Street, Suite 4600
>New York, NY 10165
>Telephone: (212) 697-6484
>Facsimile: (212) 697-7296
>Email: peretz@bgandg.com
>
>*Attorneys for Plaintiff*